**ORAL ARGUMENT NOT YET SCHEDULED**
_____

No. 13-5349
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

SAMUEL ST. JOHN,

Plaintiff-Appellant,

v.

JEH JOHNSON, Secretary,
Department of Homeland Security,

Defendant-Appellee.

_____

On Appeal from the United States District Court
for the District of Columbia
_____

**APPELLANT'S OPENING BRIEF
PUBLIC COPY – SEALED MATERIAL DELETED**
_____

Glenn Schlactus
Jennifer I. Klar
Sasha Samberg-Champion
Tara K. Ramchandani
Jean Zachariasiewicz
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W.
Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

*Attorneys for Plaintiff-Appellant*                October 22, 2014

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 26.1 and 28(a)(1), undersigned counsel certifies as follows:

**A.    Parties and Amici.**  Appellant in this Court and Plaintiff in the District Court is Samuel St. John.  Appellee in this Court and Defendant in the District Court is Jeh Johnson, Secretary of the Department of Homeland Security (substituted for former Defendant Janet Napolitano under Fed. R. App. P. 43(c)(2)).

Other parties who have previously appeared in this case are prior Defendants Janet Napolitano and Rand Beers.

There are no amici.

**B.    Rulings Under Review.**  Plaintiff-Appellant seeks reversal of the District Court's September 26, 2013 memorandum opinion and order issued by Judge Beryl A. Howell granting Defendant's motion for summary judgment, Dkt. 56, 57 (sealed opinion), and 61 (unsealed opinion, docketed November 5, 2013).  The official citation is *St. John v. Napolitano*, -- F. Supp. 2d. --, No. CV 10-216 (BAH), 2013 WL 5912526 (D.D.C. Nov. 5, 2013).  The district court's opinion is in the appendix at J.A. _____.

**C.    Related Cases.**  This matter has not previously been before this Court, and counsel is aware of no related case currently pending in this Court or in any other court.

/s/ Tara K. Ramchandani
Tara K. Ramchandani
Glenn Schlactus
Jennifer I. Klar
Sasha Samberg-Champion
Jean Zachariasiewicz
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W.
Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

*Attorneys for Appellant*

Dated:  October 22, 2014

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

GLOSSARY ..................................................................................... v

JURISDICTIONAL STATEMENT ...................................................... 1

INTRODUCTION AND STATEMENT OF THE
ISSUE PRESENTED ......................................................................... 1

STATEMENT OF THE CASE ............................................................ 3

    A. Statement of Facts ................................................................ 3

        1.  St. John's Career at Customs and Border Protection ........... 4

        2.  Owen's Decision Not to Promote St. John to CSI Director ........ 8

        3.  St. John's Tenure in El Paso ............................................. 13

    B. Procedural History and the District Court's Ruling ................ 14

SUMMARY OF ARGUMENT ............................................................ 20

ARGUMENT ................................................................................... 24

  I.  STANDARD OF REVIEW .......................................................... 24

  II.  A JURY COULD FIND DEFENDANT'S CURRENT
     EXPLANATION FOR NOT PROMOTING ST. JOHN
     TO BE PRETEXT FOR DISCRIMINATION .............................. 25

    A. Owen's Lies About Why and How St. John Was Passed Over .............. 27

    B. Consistent With Owen's History of Not Elevating Racial
       Minorities to GS-15 Positions, He Preselected Stajcar, a Less
       Qualified Candidate, Then Employed a Sham
       Selection "Process" ........................................................... 33

1. Owen's Consistent Failure to Promote Minorities to GS-15 Positions.................................................................34

2. Owen's Preselection of Stajcar ........................................37

3. Owen's Failure to Utilize a Normal Hiring Process ..........39

C. In Light of St. John's Superior Qualifications and Sterling Performance History, a Jury Need Not Believe That Owen Found Him Unqualified Based on a Small Number of Ambiguous Incidents..................................................................44

1. Contrary Evidence Undermines Defendant's Account of What Owen Took From the Incidents Upon Which He Now Relies ...........................................................................46

2. A Jury Could Find That the Incidents Say Little About St. John's Leadership Ability or What Owen Thought of It...............55

CONCLUSION ...........................................................................65

REQUEST FOR ORAL ARGUMENT ................................................66

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)(B)............................67

# TABLE OF AUTHORITIES

## CASES

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998)...........28, 29, 47, 51

*Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354 (D.C. Cir. 2013).....................24

*Colbert v. Tapella*, 649 F.3d 756 (D.C. Cir. 2011)....................................26, 31, 32

*Domínguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424 (1st Cir. 2000).......................31

*EEOC v. Am. Nat'l Bank*, 652 F.2d 1176 (4th Cir. 1981)...........................................35

*EEOC v. Boeing Co.*, 577 F.3d 1044 (9th Cir. 2009)..................................................50

*Geleta v. Gray*, 645 F.3d 408 (D.C. Cir. 2011) ..........................................28, 31, 50

*Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999) .....................................................24

*Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012)............18, 27, 28, 47, 51-52

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006)...................................................27

*Krodel v. Young*, 748 F.2d 701 (D.C. Cir. 1984)........................................37, 38, 39

*Lathram v. Snow*, 336 F.3d 1085 (D.C. Cir. 2003)...............................................43-44

*Loyd v. Phillips Bros., Inc.*, 25 F.3d 518 (7th Cir. 1994).........................................40

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).................................14, 23

*Pardo–Kronemann v. Donovan*, 601 F.3d 599 (D.C. Cir. 2010).............................24

*Patrick v. Ridge*, 394 F.3d 311 (5th Cir. 2004)..................................................58, 60

*Authorities upon which we chiefly rely are marked with asterisks.

*Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000)...................................................... 3, 20, 24, 25, 26, 34, 52

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)...........................23-24

Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160 (6th Cir. 1996)........................31

Tolan v. Cotton, 134 S. Ct. 1861 (2014)................................................................24

Valentino v. U.S. Postal Serv., 674 F.2d 56 (D.C. Cir. 1982)...................................35

Vatel v. Alliance of Auto Mfrs., 627 F.3d 1245 (D.C. Cir. 2011)......................36, 47

Walker v. England, 590 F. Supp. 2d 113 (D.D.C. 2008)...........................................51

Waterhouse v. District of Columbia, 298 F.3d 989 (D.C. Cir. 2002)........................36

*Authorities upon which we chiefly rely are marked with asterisks.

iv

# GLOSSARY

Pursuant to D.C. Circuit Rule 28(a)(3), Plaintiff-Appellant provides this Glossary of abbreviations and acronyms.  The following terms are used in this brief:

| | |
|---|---|
| Cargo and Conveyance: | Cargo and Conveyance Security |
| CSI: | Container Security Initiative |
| C-TPAT: | Customs-Trade Partnership Against Terrorism |
| ICE: | Immigration and Customs Enforcement |
| SFI: | Secure Freight Initiative |

## JURISDICTIONAL STATEMENT

This appeal is from the final order of the United States District Court for the District of Columbia (Howell, J.).  The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  It entered final judgment for Defendant and dismissed this case on September 26, 2013.  On November 22, 2013, Plaintiff filed a timely notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B).  Dkt. 62.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## INTRODUCTION AND STATEMENT OF THE ISSUE PRESENTED

Samuel St. John, who is Hispanic, was appointed acting director of his agency division.  Six months later, the permanent director position was advertised.  St. John applied.  The person charged with filling the vacancy, Todd Owen, who is non-Hispanic Caucasian, elected not to hire St. John or anyone else.  He did so without interviews, reference checks, or any other formalized process; nor did he document how and why he made the decision.  When St. John asked why he was not hired, Owen said the decision was not his and he was pleased with St. John's performance.

In fact, Owen had made the decision, which was consistent with Owen's history:  in seven opportunities to make a GS-15 appointment, Owen never selected a racial minority.  Consistent with that history, Owen

1

**MATERIAL UNDER SEAL DELETED**

before advertising the position already had decided to hire Daniel Stajcar, a non-Hispanic Caucasian man from outside the division with far less experience than St. John and ██████████████████.  Owen encouraged Stajcar to apply, and he did, but Stajcar had too little time as a GS-14 to be eligible.  Owen waited until Stajcar became eligible, relisted the position, and hired him.  Owen again told St. John that the decision was not his.

After St. John initiated this Title VII suit, alleging national origin discrimination, Owen offered a different story.  Now acknowledging he was the decision-maker, he claimed he found St. John's "leadership" ability inadequate.  This deficiency, he contended, was evidenced by eight specific incidents.  Looked at in the light most favorable to St. John, however, none of these banal incidents demonstrates any significant leadership failure, let alone one a reasonable person would view as disqualifying the acting director from obtaining the permanent position.  Nor does the evidence, taken most favorably to St. John, show that Owen so believed at the time. Indeed, some of the incidents to which Owen now points occurred after Owen purportedly decided St. John's leadership ability was lacking, and so they cannot have informed his decision.

Under *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-48 (2000), summary judgment ordinarily may not be granted in a Title VII suit once a plaintiff produces evidence from which a jury may conclude that the defendant's purported justification for acting is pretextual.

The question presented is:

Could a jury disbelieve Owen's current account of why he did not promote St. John, in light of (1) inconsistencies in Owen's accounts of how and why St. John was passed over, as well as in his own assessment of St. John's performance; (2) Owen's failure ever to promote a racial minority to a GS-15 position; (3) Owen's preselection of a less qualified candidate; (4) Owen's failure to use any normal hiring process; and (5) the failure of the incidents to which Owen now points to support his purported conclusions regarding St. John's leadership abilities, which he never documented contemporaneously?

## STATEMENT OF THE CASE

### A. Statement of Facts

The following statement of facts is supported by evidence in the record taken most favorably to the plaintiff, as is required on a defendant's summary judgment motion. *Reeves*, 530 U.S. at 150-51.

*1.  St. John's Career at Customs and Border Protection*

Plaintiff Samuel Rivas St. John is Hispanic.  Dkt. 52-3 at 3-5, 9, 310; Pl. Ex. 14-S[1] (under seal).  St. John's first language is Spanish, which he speaks with native fluency.  Dkt. 52-4 at 268; Dkt. 52-3 at 388.

St. John began his long and successful career with the U.S. government in 1982.  Dkt. 52-3 at 318.  In 1987, he joined the agency then known as the U.S. Customs Service.  *Id*. at 319.  That agency, now known as Customs and Border Protection, has become a component of the U.S. Department of Homeland Security.

Among the divisions of Customs and Border Protection is Cargo and Conveyance Security ("Cargo and Conveyance"), which oversees the arrival of all containers to America.  Cargo and Conveyance, in turn, has nine divisions.  The following organizational chart illustrates the relationship between these divisions at the end of 2008 and, where appropriate, identifies individuals relevant to this case:

---

[1] Pages filed under seal in the District Court are collected in a separate, sealed appendix (S.A.) filed under seal in this Court.



**Customs & Border Protection**
Commissioner: W. Ralph Basham
Deputy Commissioner: Jayson Ahern

13 Additional Offices
(not relevant here)

**Office of Field Operations**
Assistant Commissioner:
Thomas Winkowski

**Office of International Affairs**
Assistant Commissioner:
Allen Gina

**Cargo & Conveyance Security**
Executive Director: Todd Owen

7 Additional Divisions
(not relevant here)

**Canine Enforcement Program**

**Cargo Control**

**Cargo Verification**

**Trade Operations**

**Non-Intrusive Inspection Equipment**

**Secure Freight Initiative ("SFI")**
Director: Richard DiNucci

**Customs Trade Partnership Against
Terrorism ("C-TPAT")**
Director: Bradd Skinner

**National Targeting Center – Cargo
("NTC-C")**
Director: Frank Jaramillo

**Container Security Initiative
("CSI")**
Acting Director: Samuel St. John

**Buffalo Field Office**

**Herndon (DC) Field Office**
Director: Daniel Staicar

**Houston Field Office**

**Los Angeles Field Office**

**Miami Field Office**

**Newark Field Office**

**New York Field Office**

**Operations**
Branch Chief: James Carson

**Operational Support**
Branch Chief: Febe Hernandez

**Strategic Planning & Evaluation**
Acting Branch Chief: Lisa Clark

5

The Container Security Initiative ("CSI") was formed within Cargo and Conveyance after the September 11, 2001 attacks.  Dkt. 52-3 at 397. Working with foreign governments, CSI targets and screens high-risk cargo containers headed to the United States before those containers depart from foreign ports rather than waiting to screen them when they arrive here.  *Id.* at 401.  In 2004, Allen Gina, then CSI's head, hired St. John based on St. John's excellent reputation within Customs and Border Protection.  *Id.* at 419-23.  St. John was promoted soon thereafter to what is now known as CSI's Branch Chief of Strategic Planning and Evaluation.  *Id*. at 423.

As Branch Chief, St. John had many high-level responsibilities.  For example, he had daily contact with high-level foreign officials and traveled abroad frequently; he developed and supervised procedures for evaluating CSI ports; and he spoke frequently at conferences, some of which he helped organize, on supply chain security.[2]  Dkt. 52-3 at 98, 430-32, 435-36, 441, 451.  As his title suggests, St. John also was responsible for CSI's strategic planning.  He drafted the initiative's first 5-year strategic plan and its yearly progress reports to Congress; both required soliciting input from all parts of

---

[2]  For example, St. John planned and executed the Fourth Annual Global Targeting Conference of Technical Experts, a multi-day conference featuring hundreds of experts from foreign governments and high-level Customs officials.  *See* Dkt. 52-3 at 112, 129-30, 448-50.

CSI.  Dkt. 52-3 at 111-12, 131-33; Dkt. 52-4 at 2-45.  He took the lead in implementing congressional mandates in other ways, including preparing action plans in response to audits from the Government Accountability Office and the Office of the Inspector General, and he worked with the other branch chiefs to follow through on those action plans.  *See* Dkt. 52-3 at 433-34, 438-39, 452-53.  His duties also included supervisory, disciplinary, and training responsibilities over the CSI employees in his branch.  *Id.* at 123, 462-64, 471-72.

St. John received a perfect score on every performance evaluation as Branch Chief and earned performance cash awards each year.  Dkt. 52-3 at 267-79; Dkt. 52-4 at 47, 49 (Perf. Evals.).  His colleagues and supervisors lauded him as an effective manager, a bridge-builder, and a good leader.  *E.g.*, Dkt. 52-3 at 123-24, 146; Dkt. 52-4 at 100-02.  Marsha Wiggins and Gina, both former heads of CSI, testified that St. John improved CSI's efficiency, such as by identifying the need for – and then overseeing the development and implementation of – an automated tool for CSI port evaluations.  Dkt. 52-3 at 140, 435-440.

In late 2007, St. John was appointed Acting Director of CSI.  Dkt. 44-6 at 95-96.  Todd Owen, then the Executive Director of Cargo and

Conveyance, appointed St. John as Acting Director based on the recommendation of Wiggins, the departing CSI Director.  Dkt. 52-3 at 30.

While Acting Director, St. John supervised approximately 250 employees and oversaw a $150 million budget.  *Id.* at 31, 33.  St. John's supervisees and co-workers praised his leadership, willingness to help, and ability to encourage innovation as Acting Director.  *E.g.*, Dkt. 52-3 at 190-92, 240-43.

Owen told St. John during this time that he was managing CSI well.  Dkt. 52-3 at 331, 336.  He did not say anything to St. John that indicated that he thought otherwise, nor did he make any contemporaneous record of observing any deficiency in St. John's performance.  Owen did not give St. John a formal performance evaluation as Acting Director.  *Id.* at 370.  While it was Owen's practice to make contemporaneous notes on performance issues for the personnel files of his direct reports, he never recorded any such notes in St. John's file.  *See* Dkt. 52-3 at 27.

### 2. *Owen's Decision Not to Promote St. John to CSI Director*

In June 2008, while St. John was Acting CSI Director, the vacancy announcement for the permanent CSI Director position was posted.  Dkt. 52-4 at 104-125.  St. John applied.  He ranked number one on the selection register given to Owen; he was the only candidate to receive a perfect score.

Pl. Ex. 27 (under seal); Dkt. 52-4 at 129-30; Dkt. 44-3 at 16. The next two highest-ranked candidates on the selection register were also minorities (Black and Asian-American). Pl. Ex. 29 (under seal).

Rather than hire St. John – or any of the others on the selection register – Owen chose to return the selection register unused, thus leaving the position open. Dkt. 44-4 at 2. While the government now contends that this decision represented a determination that St. John and the others lacked the "leadership" skills for the position, Dkt. 52-3 at 79, Owen left no contemporaneous evidence memorializing such a determination. Dkt. 52-3 at 64-65.

Upon learning that no selection had been made, St. John asked Owen whether his performance had been deficient. *Id.* at 334-36. Owen responded that St. John was doing an excellent job. He did not identify any performance problems, with respect to leadership or otherwise. *Id.* at 70-71, 334-36.

Instead, Owen told St. John that the decision was "out of his hands." He told St. John that the decision was made by Assistant Commissioner Thomas Winkowski, who wanted somebody from outside CSI. Dkt. 52-3 at 336-37. This was not true. In fact, by Owen's own subsequent admission, it

9

was entirely his decision to return the June 2008 register unused. *Id.* at 66-67, 79.

Owen's decision to hire nobody instead of St. John (or the two other minorities atop his selection register) was consistent with his pattern with respect to high-level appointments. While in charge of Cargo and Conveyance, Owen selected seven individuals for permanent GS-15 positions; all were non-Hispanic Caucasians. Pl. Ex. 4-S, Owen Dep. at 272-73 (under seal); Pl. Ex. 34 (Response 18) (under seal).

Owen had tried to put his preferred non-Hispanic Caucasian candidate on his selection register, but his efforts were unsuccessful. Before posting the June 2008 vacancy, Owen discussed the position with Daniel Stajcar, who is non-Hispanic Caucasian, and encouraged Stajcar to apply. At Owen's urging, Stajcar applied for the vacancy in June 2008, although he lacked the required year of GS-14 experience. Dkt. 52-4 at 178-79. Stajcar did not appear on the June 2008 selection register because he did not meet this requirement. Pl. Ex. 33 (under seal).

Stajcar, unlike St. John, had never served at the director level, and so he did not have the experience St. John did of supervising 250 employees. He had less than the requisite year of GS-14 experience (whereas St. John had served at the GS-14 level for almost a decade, Dkt. 52-3 at 327-28); he

10

**MATERIAL UNDER SEAL DELETED**

also had far less experience overall in Customs and Border Protection than St. John.  Pl. Ex. 35 (under seal); Dkt. 52-3 at 199.  ██████████

████████████████████████████████████

████████████████████████  Pl. Ex. 31 (under seal).

And Stajcar had never served a day in CSI.  Pl. Ex. 35 (under seal).

When Stajcar's name did not appear on the June 2008 selection register, Owen chose to hire nobody.  Before deciding not to hire the three minority candidates atop the selection register, Owen did not interview any of them.  Dkt. 52-3 at 59.  Nor did he speak with the candidates' superiors or contact their other references.  Dkt. 52-3 at 59-60.  Owen did not review the candidates' performance evaluations or any other part of their personnel records.  Dkt. 52-3 at 62.

Instead, Owen now contends, he relied almost exclusively on his "personal knowledge" of St. John and the other candidates.  Dkt. 52-3 at 63. If he did not know a candidate well already, he now says, he assumed that was because "they're not an outstanding performer which would cause me not to be interested."  *Id.*

In ostensibly deciding largely based on his prior knowledge of the candidates, Owen deviated from accepted and routine hiring processes at Customs and Border Protection.  While no formal rule required any

11

particular process, other leaders testified that the agency norm was to utilize a systematic evaluation process before selecting. This process usually included interviews and reference checks. Dkt. 52-3 at 159-61, 177-78, 214-15, 422, 473-78; Dkt. 52-4 at 59-60, 91-92. Some officials went further to ensure fair decision-making, such as by using a panel to review eligible candidates or by creating a matrix to compare them. Dkt. 52-3 at 161, 174-75, 473-79. There is no evidence that any other Customs and Border Protection official chose, as Owen did, not to gather information about candidates through any process.

In August 2008, Owen asked Stajcar when he would complete a full year as a GS-14 and become eligible for the CSI Director position. Dkt. 52-4 at 197. Stajcar replied that he would be eligible in September 2008. *Id.* In October 2008, Owen re-posted the position. Dkt. 52-4 at 199-220. This time, in addition to Stajcar, Owen also encouraged five other individuals – including two of the three CSI Branch Chiefs – to apply; each was non-Hispanic Caucasian. *See* Pl. Ex. 4-S, Owen Dep. at 155-159 (under seal); Pl. Ex. 34 (Response 18) (under seal). He did not similarly encourage the only minority Branch Chief, Febe Hernandez (who is Hispanic), let alone St. John, who was CSI's Acting Director and had been a branch chief. *See id.*

St. John advised Owen that he planned to reapply.  Dkt. 52-3 at 331-32.  Owen responded:  "[D]on't bother, you're going to El Paso."  *Id.*  This statement referred to an open GS-14 field position for which St. John had applied because he believed he would never get promoted at Headquarters.  *Id.* at 338-39, 344, 386-87.  Owen again told St. John that Winkowski oversaw the hiring and that the decision was "out of his hands."  *Id.* at 337.  St. John submitted his application anyway after telling Owen that he preferred the CSI Director position over the El Paso position.  *Id.* at 72, 331-32.

Owen selected Stajcar.  Once again, he did not conduct interviews, check references, or engage in any other process calculated to give him an adequate understanding of the candidates' abilities.  Dkt. 52-3 at 59-65.  Owen's superiors, relying on Owen's assessment, rubber-stamped Stajcar's selection.  *E.g.*, Dkt. 52-4 at 188.

### 3. *St. John's Tenure in El Paso*

In November 2008, after Owen made clear that St. John had no chance to become CSI Director, St. John accepted the El Paso position.  Dkt. 52-3 at 338-39, 344, 386-87.  Owen had recommended him highly for the position, specifically noting St. John's managerial skills.  Dkt. 52-4 at 76, 78, 79-80.

St. John continued performing high quality work in El Paso. His supervisor, Ana Hinojosa, testified that St. John was a huge asset and met her need for a strong leader. Dkt. 52-4 at 81-83, 90. Hinojosa testified that St. John's strengths included a commitment to innovation and change, effective problem resolution skills, and excellent strategic thinking. *Id.* at 84, 86, 87-89.

St. John remained in the El Paso position until January 2010, when he left Customs and Border Protection. Hinojosa was "very sad to see him go." Dkt. 52-4 at 90.

## B. Procedural History and the District Court's Ruling

After exhausting administrative remedies, St. John filed this action in February 2010 against the Secretary of the Department of Homeland Security ("Defendant"). He alleged he was denied promotion because of national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000, *et seq.*[3]

Following discovery, Defendant moved for summary judgment. Defendant conceded that, under the *McDonnell Douglas* burden-shifting framework for employment discrimination cases, St. John set forth a *prima*

---

[3] St. John also originally alleged a retaliation claim and a claim under the Age Discrimination in Employment Act of 1967. He does not appeal the dismissal of those claims.

*facie* case.  Accordingly, Defendant articulated a nondiscriminatory reason that, Defendant contended, explained the failure to promote St. John.

Owen no longer said that Winkowski made the decision or that Owen was pleased with St. John's performance.  Instead, he now asserted that he decided based on St. John's performance.  Defendant further asserted that Owen's negative appraisal of St. John was based on eight specific incidents that, Defendant contended, convinced Owen that St. John lacked the necessary leadership qualities.

St. John responded with evidence that Owen did not actually draw, nor could have drawn, such a conclusion from these incidents.  He also pointed to a variety of bases on which, pursuant to well-established precedents, a jury reasonably could infer that Defendant's proffered reason was a pretext.  On September 26, 2013, the District Court nonetheless granted Defendant's motion and dismissed the complaint.

The District Court did not begin by describing the evidence most favorably to St. John.  Instead, in its initial factual recitation, it omitted evidence suggesting that Owen's current story was not credible.  It did not mention, for example, evidence that St. John performed well as Acting Director and that Owen told him so contemporaneously.  Nor did it mention Owen's history of not promoting minorities to GS-15 positions, or the

unusual procedure by which, consistent with that history, he chose not to hire St. John when his preferred candidate was absent from the selection register.

Instead, the District Court began and ended its opinion with a factual recitation that largely adopted Defendant's version of events. It asserted, as though the matter were uncontested, that Owen notified St. John of deficiencies in his performance on "at least eight separate occasions," Dkt. 61 ("Mem. Op.") at 5. It then described these incidents based on the testimony of Owen and other defense witnesses. *See id.* at 5-8 (citing to Owen's testimony nine times). The District Court did not explain why a jury could not credit St. John's alternative account of the incidents, under which Owen did not (and could not) view them as disqualifying.[4]

The District Court repeatedly made clear that it accepted as a fact not in controversy Defendant's assertion that the incidents Defendant cited truly convinced Owen that St. John was unqualified to lead CSI. *See, e.g.*, Mem. Op. at 24, 25-27, 41, 43. It asserted that various e-mails contemporaneously documented that Owen actually believed this and that he told St. John as much. *See id.* at 41 ("there is a wealth of evidence indicating Owen made the plaintiff aware of his deficiencies in e-mails"). It did not explain how

---

[4] This account is described in detail in Point II.C (pp. 44-64), *infra*.

these e-mails documented Owen's negative view of St. John's abilities or engage with St. John's argument that a jury, after looking at these e-mails, could find that they demonstrated no such opinion.

Having accepted without argument or explanation the key factual premises underlying Defendant's position – that Owen's proffered reason for passing over St. John was truthful and supported by contemporaneous documentation – the District Court considered whether a jury nonetheless could find that reason to be pretextual. It concluded that a jury could not. Mem. Op. at 22-23. The District Court analyzed each indicator of pretext that St. John proffered separately and found each insufficient. It did not discuss how these multiple, related indicators of pretext reinforce each other.

The District Court found a jury could not infer pretext from the inconsistency between Owen's 2008 position – that Owen was pleased with St. John's performance but Winkowski decided against promoting St. John – and his current account. It acknowledged that these accounts "varie[d] slightly" but reasoned that Owen's original story that the decision was Winkowski's was "literally true" because Winkowski had ultimate responsibility for the selection. Mem. Op. at 28. Moreover, it found, "a statement by Owen that he was 'happy with [the plaintiff's] work' is different from a statement that he believed the plaintiff was qualified to take

17

on the position permanently." *Id.* In any event, it reasoned, Owen merely was being "tactful" by not mentioning performance issues and so any inconsistency did not evidence pretext. *Id.* at 27-28.

The District Court then held that no jury could find St. John to be "significantly better qualified" than the selectee, Stajcar. Mem. Op. at 35-37. It thus applied this Court's test for plaintiffs relying on comparative qualifications evidence *alone* to show pretext, rather than the lower standard applicable where a plaintiff relies on other evidence as well. *See Hamilton v. Geithner*, 666 F.3d 1344, 1352, 1355 (D.C. Cir. 2012). The District Court accepted Stajcar's self-interested testimony that his GS-14 position had more responsibility than St. John's. Mem. Op. at 32. It also accepted Defendant's assertion that Owen believed Stajcar's lack of experience, both in general and in CSI, to actually bolster his qualifications. *Id.* St. John's perfect evaluations and other evidence of stellar performance were immaterial, it asserted, because the best evidence of St. John's qualifications was his performance as Acting Director. That performance, it stated (again accepting Defendant's characterization of the record), "was not as 'successful' as he perceived it to be." *Id.* at 33.

The District Court acknowledged that a decision-maker's use of subjective criteria such as "leadership" ability is "traditionally viewed with

18

skepticism when used to support an adverse employment decision." Mem.
Op. at 36. Nonetheless, it said, no such skepticism was warranted here,
because, among other things, Owen adequately documented St. John's
"specific deficiencies." *Id.* at 37. The District Court also found Owen's
idiosyncratic hiring process irrelevant, because the agency had no "uniform
policy" for hiring from which he could deviate sufficiently to suggest
pretext. *Id.* at 39. And it held that the record did not support a finding that
Stajcar was preselected, and that any such preselection was legally irrelevant
anyway without more evidence of discrimination. *Id.* at 39-40.

Finally, the District Court found it irrelevant that Owen never had
promoted a member of a racial minority group to a permanent GS-15
position despite seven opportunities to do so. Any argument that Owen's
track record contributed to an inference of pretext was "substantially
undercut," it found, by Owen's appointment of St. John and one other
Hispanic to acting positions. Mem. Op. at 42. The District Court rejected as
"conclusory" St. John's argument that these appointments to short-term
acting positions were not equivalent to promotions to permanent positions.
*Id.* at 42 n.13. It ignored entirely evidence that Owen encouraged several
non-Hispanic Caucasians to apply for the CSI Director vacancy, but no
racial minorities.

19

St. John filed a timely notice of appeal on November 22, 2013.

Defendant moved for summary affirmance and St. John cross-moved for

summary reversal.  On August 4, 2014, this Court denied both motions.

## SUMMARY OF ARGUMENT

The District Court analyzed this case without regard to the basic rules

of summary judgment.  The central question on Defendant's motion for

summary judgment should be whether a jury must find the explanation

Defendant now proffers for passing over St. John for the permanent CSI

Director position to be a sincere one.  But the District Court simply assumed

the sincerity of that explanation and described the facts purportedly

motivating Owen entirely as Defendant would, with liberal doses of Owen's

self-interested testimony.  Having done that, it unsurprisingly found St.

John's contrary evidence insufficient for a jury to find pretext.  This is not

how summary judgment should be conducted in a Title VII case.

A Title VII plaintiff can survive summary judgment with evidence

that permits a jury to disbelieve the defendant's story, because a jury can

then infer that the false story is a pretext covering for discriminatory

conduct.  *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 147-148 (2000).  Thus, the District Court should have begun by

ascertaining whether St. John produced evidence on which a jury could

permissibly rely to conclude that Defendant's proffered explanation – St. John's purported leadership failures as Acting Director – is a sham. St. John pointed to multiple reasons why, in accordance with well-established precedent, a jury could so conclude.

Among other things, St. John pointed to: (1) Owen's inconsistent explanations for not promoting him, explanations so divergent that at least one must be false; (2) Owen's pattern of failing to hire minorities for GS-15 positions; (3) Owen's preselection of Stajcar, a non-Hispanic Caucasian whom a reasonable jury could find less qualified than the Hispanic candidate passed over; and (4) Owen's failure to follow any normal hiring process before rejecting the three minority candidates at the top of his June 2008 selection register. Each is a recognized ground for finding pretext under controlling precedents. A jury considering them together readily could find that Owen's current contention that he deemed St. John to lack "leadership" is pretext. *See* Points II.A (pp. 27-32) and II.B (pp. 33-44).

Only then should the District Court have considered Defendant's case. It should have done so to assess whether, notwithstanding that St. John points to recognized indicia of pretext, Defendant's evidence of the sincerity of Owen's professed motivation is so ironclad that a jury would have no

choice but to believe it.  Defendant cannot come close to making that

showing.  *See* Point II.C (pp. 44-64).

Owen left no contemporaneous record explaining why he did not

promote St. John, nor any record of dissatisfaction with St. John's

performance.  The failure to do so raises red flags in any case, but

particularly here, where the justification Owen now proffers – St. John's

supposed leadership deficiency – is nebulous and subjective enough to be

easily manufactured after the fact.  And Owen's supposed conclusion about

St. John's leadership capacity conflicts with the sterling reviews St. John

received throughout his tenure at Customs and Border Protection – including

for leadership ability – and other evidence that St. John was an excellent

acting director.

Thus, to obtain summary judgment, Defendant must prove that the

incidents to which Defendant now points speak for themselves regarding

Owen's motivations, leaving no room for interpretation.  Defendant must

prove either (1) that these incidents so conclusively demonstrate St. John's

lack of fitness that Owen must have lost confidence in him or (2) that they

conclusively demonstrate that Owen actually believed St. John to be unfit

for the position.  But the actual record of these incidents, looked at most

favorably to St. John and stripped of the self-serving gloss that Owen now

adds, cannot bear that weight.  Rather, a jury easily could view each
"incident" as a banal bureaucratic conversation that says little to nothing
about St. John's fitness to lead or what Owen's views about him might have
been.  Moreover, some of these incidents occurred after the point at which,
Owen now contends, he decided St. John was unfit to be CSI Director.  A
jury not only could find Defendant's showing insufficient to overcome
evidence of pretext; it could find further evidence of pretext in Defendant's
pointing to incidents that plainly did not contribute to Owen's decision.

At the end of the day, the question before the District Court on
summary judgment was not whether a jury *would* find that Defendant acted
with discriminatory motive, but rather whether Defendant *could*.  A jury is
entitled to make such a finding on this record.  This Court should reverse
and remand for trial.

As a preliminary matter, whether a jury would be entitled to
disbelieve Owen's current story is the only question at issue.  Under the
familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v.
Green*, 411 U.S. 792 (1973), and its progeny, St. John made out a *prima
facie* case of employment discrimination; Defendant, in turn, proffered a
legitimate, non-discriminatory reason for Defendant's decision.  The
remaining question, then, is whether a jury may find that "the employer's

23

proffered explanation is unworthy of credence." *Texas Dept. of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 256 (1981). If so, the jury may further

infer that the disbelieved story is a cover for discriminatory purpose.

*Reeves*, 530 U.S. at 147-148.

## ARGUMENT

## I.

## STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de*

*novo*. *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir.

2013).

At summary judgment, "a 'judge's function' . . . is not 'to weigh the

evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866

(2014) (citation omitted); *see also Pardo-Kronemann v. Donovan,* 601 F.3d

599, 604 (D.C. Cir. 2010). Accordingly, this Court may not "resolve

genuine disputes of fact in favor of the party seeking summary judgment."

*Tolan*, 134 S. Ct. at 1866. Rather, it must "assume the truth of all statements

proffered by the party opposing summary judgment," *Greene v. Dalton*, 164

F.3d 671, 674 (D.C. Cir. 1999), "draw all reasonable inferences in favor of

the nonmoving party," *Reeves*, 530 U.S. at 150, and "disregard all evidence

favorable to the moving party that the jury is not required to believe," *id.* at

151.  The court "may not make credibility determinations or weigh the

evidence."  *Id.* at 150.

In particular, this Court should not credit the testimony of Defendant's

interested witnesses even without evidence directly contradicting it, because

a jury may simply disbelieve self-interested testimony.  *See Reeves*, 530 U.S.

at 151; *see also In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009)

(weighing of self-serving testimony from interested witnesses is for finder of

fact at trial).

## II.

### A JURY COULD FIND DEFENDANT'S CURRENT EXPLANATION FOR NOT PROMOTING ST. JOHN TO BE PRETEXT FOR DISCRIMINATION

A reasonable jury could disbelieve Defendant's current explanation

for not hiring St. John – that certain specific incidents during his tenure as

Acting Director led Owen to believe that he lacked the requisite leadership

ability.  It could, in turn, infer that discrimination based on national origin

infected the decision to pass over St. John for the permanent CSI director

position.

If a jury may find the employer's proffered reason to be pretext, it

usually may further infer that the decision was infected with discriminatory

25

motivation, such that the plaintiff prevails on the ultimate question. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000). That is because it is reasonable to "infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* at 147. In all but the most unusual circumstances – none of which pertains here – it is error to require a plaintiff who has demonstrated the defendant's proffered reason to be pretextual to "introduce additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 149.[5]

A plaintiff may create a reasonable inference of pretext in a number of ways. Here, St. John has produced multiple bases for a jury to find pretext. The District Court erred in finding each of these reasons – individually and collectively – insufficient.

As an initial matter, the District Court erroneously viewed these various bases for inferring pretext as independent legal and factual arguments that can be considered separately. *See, e.g.*, Mem. Op. at 23 ("The plaintiff presses seven arguments to discredit the defendant's explanation."). They are not. Rather, each of the bases for inferring pretext

---

[5] This Court has recognized "the exceptional case" where the record "'conclusively'" shows that some other nondiscriminatory reason was the real reason, or the evidence of pretext is very weak and there is "'abundant and uncontroverted independent evidence'" of nondiscrimination. *Colbert v. Tapella*, 649 F.3d 756, 760 (D.C. Cir. 2011) (quoting *Reeves*, 530 U.S. at 148).

discussed below is interwined with, and reinforces, the others.  For that reason, on a motion for summary judgment, courts must consider evidence of pretext cumulatively in light of "the record as a whole" and all of the "'flaws in the employer's explanation.'"  *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)).

A jury would not be asked, for example, to find pretext *solely* from the fact that St. John's experience more obviously qualified him for the position, as the District Court seemed to believe.  *See* Mem. Op. at 31 ("the plaintiff's qualifications compared to Stajcar's qualifications do not present nearly so stark a comparison [for a juror to] infer discrimination on the basis of a comparison of qualifications *alone*.") (internal quotation marks and citation omitted) (emphasis added).  Rather, the jury would be asked to compare the two candidates' qualifications as just one piece of a larger puzzle that, when fit together, creates a clear picture of pretext.  So, too, should this Court.

## A. Owen's Lies About Why and How St. John Was Passed Over

Perhaps the most straightforward basis for inferring pretext is Owen's irreconcilable stories as to who decided to pass St. John over for the permanent CSI Director position and what he thought of St. John's

27

performance.  Owen now contends that the decision was based entirely on his own determination that St. John's performance as Acting Director demonstrated that St. John was not qualified for the permanent position. Prior to litigation, however, he told St. John that St. John was doing a good job and that the decision not to promote St. John was not his.

A reasonable juror may find that an employer's inconsistent explanations for its actions indicate pretext and "support an inference of intentional discrimination." *Hamilton*, 666 F.3d at 1351 (citation omitted); *see also Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011).  Further, "[i]f the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1293 (D.C. Cir. 1998) (en banc).  A jury can readily find that Owen offered such a lie here; at the very least, it can find that Owen's explanations were inconsistent.

Owen's original explanation to St. John, which he offered in both August and October of 2008, cannot be reconciled with the story that Defendant now offers.  When St. John asked in August 2008 why he was not selected, Owen replied that Winkowski (not Owen) was the decision-maker and Winkowski wanted someone from outside CSI.  Owen added that St.

28

John was doing an excellent job managing the program and he was happy with St. John's work. Then, in October 2008, Owen again told St. John that the decision was out of his hands and Winkowski was the decision-maker.

Owen now asserts that he, not Winkowski, was the decision-maker, and that he believed St. John's leadership was lacking. On its face, this is an entirely different rationale, such that Owen could not have believed both reasons to be true. Perhaps Owen was lying in 2008; perhaps he is lying now; perhaps he lied both times. What is certain, if a jury accepts the truth of St. John's testimony (as must be assumed in this posture), is that Owen has at some point lied about who made the decision, the basis for the decision, and his own view of St. John's performance. Such lies can, by themselves, create an inference of pretext and discriminatory intent. *Aka*, 156 F.3d at 1293.

The District Court nonetheless strained to construe Owen's conflicting explanations as consistent, such that they both could be truthful. It reasoned that, since "the ultimate decision was up to Winkowski, not Owen," Owen's original statement could be "literally true" without contradicting Owen's current account. Mem. Op. at 28. Moreover, it found, Owen's selection of someone from outside CSI was consistent with the reasoning that Owen untruthfully attributed to Winkowski, and so "there is no factual disconnect

29

between the reason offered the plaintiff, the reason the defendant offers now, and the actions the defendant took at the time." *Id.* at 29.  The District Court found it irrelevant that Owen told St. John that he was "happy" with St. John's work, since that was "different from a statement that he believed the plaintiff was qualified to take on the position permanently." *Id.* at 28.  And any inconsistency that might exist would not be evidence of pretext, the District Court found, because Owen was merely being "tactful in not stating bluntly that the plaintiff did not have sufficient leadership skills for a GS-15 position." *Id.*  None of this reasoning is valid on a motion for summary judgment.

Owen's initial statements were not even "literally true."  Owen said that Winkowski decided not to select St. John.  In fact, because Owen returned the selection register unused, Winkowski not only made no such decision, he had no opportunity to do so.  Owen's initial decision not to recommend anyone thus never received Winkowski's imprimatur.  And while Winkowski signed off on Owen's later recommendation to hire Stajcar, he was not presented the option of hiring St. John instead.

Similarly, Owen's original statement that he was "pleased" with St. John's performance is at odds with his current position that St. John's performance was deficient.  And a jury need not agree that Owen was

30

truthful in 2008 because he ultimately hired someone from outside CSI, in accord with the preferences he falsely attributed to Winkowski.  It could think, instead, that Owen – knowing he likely would hire Stajcar – merely spun a story consistent with the available facts.

In any event, a jury could at least infer that Owen's initial statement was so intentionally misleading that whether any of it was "literally true" is irrelevant.  This Court and others have consistently rejected semantic gamesmanship in favor of a common-sense determination of what a juror could infer about the speaker's credibility from shifting explanations.  *See Colbert v. Tapella*, 649 F.3d 756, 759 (D.C. Cir. 2011) (it is sufficient that "*part* of [employer's] stated rationale for passing over [employee] was not true.") (emphasis added); *Domínguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) (jury may infer pretext from explanations that are "different and *arguably* inconsistent") (emphasis added), quoted with approval by *Geleta*, 645 F.3d at 413; *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) (evidence of pretext where employer "made no mention of any work performance problems" when asked by plaintiff why he was not hired, only to assert performance rationale in litigation).

31

Compounding these errors, the District Court inappropriately put the best possible spin on Owen's lies. Perhaps a jury could find, as the District Court did, that Owen was merely being tactful. But it would not be required to draw this conclusion – particularly since evidence in the record suggests that this was not Owen's style. *See* Dkt. 52-3 at 90-91, 219-221; Dkt. 52-4 at 160 (testimony as to Owen's characteristic bluntness).

This case is on all fours with *Colbert*. There, an employer gave an initial explanation for not selecting the plaintiff, then later revised that reason. The employer argued before this Court that the first statement was "not a lie because [the employer] said it 'out of anger more than anything else.'" *Colbert*, 649 F.3d at 759 (citation omitted). This Court found that argument to be "nothing more than a lawyerly effort to downplay problematic evidence." *Id.* A lie, it found, carries "considerable evidentiary significance regardless of [the employer's] stated motivation." *Id.* (citation omitted). Based almost entirely on that lie, this Court reversed a grant of summary judgment and remanded for trial.

This Court thus can reverse solely on that basis. St. John, however, can point to much more.

32

### B. Consistent With Owen's History of Not Elevating Racial Minorities to GS-15 Positions, He Preselected Stajcar, a Less Qualified Candidate, Then Employed a Sham Selection "Process"

A reasonable jury could conclude that, to avoid promoting St. John or any other racial minority to CSI Director, Owen used a sham selection process. It could conclude this, in part, from Owen's track record: Owen never hired a racial minority for a permanent GS-15 position while Executive Director of Cargo and Conveyance. Not only did he pass over those minorities who applied, he actively encouraged non-minorities alone to apply for such positions. A jury also could find that, rather than looking in good faith for the best candidate to head CSI, Owen preselected Stajcar, a non-Hispanic Caucasian candidate. And it could find that Owen's selection "process" – which, by his own account, consisted largely of analyzing his own purported previous impressions of the candidates – not only deviated from normal hiring practices within Customs and Border Protection but facilitated intentional discrimination by obscuring the real reasons for his decision.

Each of these three points could, at the least, contribute to an inference that Owen's current explanation for not elevating St. John to the position is pretext. Taken together, and looked at alongside evidence that Owen lied about the reasons for his decision, they easily could lead a

33

reasonable jury to disbelieve Owen's story.  Once again, to survive summary

judgment, St. John need only show that a reasonable jury could reject

Defendant's stated account of how and why the decision was made.  *Reeves*,

530 U.S. at 147-148.

1.  *Owen's Consistent Failure to Promote Minorities to GS-15*
    *Positions*

A jury could find Owen's story less likely to be truthful because of

Owen's own track record.  In his time as Executive Director of Cargo and

Conveyance, Owen selected only non-Hispanic Caucasians for the seven

permanent GS-15 positions he filled.  That history could suggest to a jury

that Owen acted with a less than open mind when he rejected as unqualified

to fill the June 2008 vacancy all candidates on his selection register –

including the three top candidates, all of whom were racial minorities – then

chose a non-Hispanic Caucasian in October 2008.  Moreover, Owen

encouraged five non-Hispanic Caucasians in addition to Stajcar to apply for

the October 2008 vacancy, including the two non-Hispanic Caucasian CSI

Branch Chiefs.  The only Branch Chief he did not encourage to apply was

Febe Hernandez, who is Hispanic and was the only minority Branch Chief.

A jury could conclude that Owen, unable to bring himself to hire any of the

three minorities atop the selection register for the June 2008 vacancy,

actively ensured that he would see more white candidates in October 2008.

34

Standing by itself, Owen's failure ever to select a racial minority for a permanent GS-15 position – while actively encouraging non-Hispanic Caucasians alone to apply – is evidence of discrimination. Perhaps a jury could not view it as conclusive evidence of discrimination standing alone, as it could if Owen had failed to select a minority hundreds of times. But a consistent failure to hire is admissible evidence of discriminatory intent that carries some weight, alongside other indicia of pretext, long before the sample size gives it statistical significance. *See Valentino v. U.S. Postal Serv.*, 674 F.2d 56, 72-73 (D.C. Cir. 1982) ("'inexorable zero' can raise an inference of discrimination even if the subgroup analyzed is relatively small.") (citation omitted); *cf. EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1200 (4th Cir. 1981) (while "the use of an all-white interviewing staff standing alone could not support a determination of liability," it would be error to exclude that fact "as having no probative force on the issue of discriminatory hiring").

The District Court nonetheless found that any inference from Owen's dismal record was "substantially undercut" by Owen's appointment of St. John and one other Hispanic to acting positions. Mem. Op. at 42-43. But an appointment to an acting position has far less significance than a promotion to a permanent position, and so the decision is made much differently. The

35

District Court's reliance on *Vatel v. Alliance of Auto Manufacturers*, 627

F.3d 1245, 1247 (D.C. Cir. 2011), and *Waterhouse v. District of Columbia*,

298 F.3d 989, 996 (D.C. Cir. 2002), is therefore misplaced; both involved

appointments to permanent positions.  *See* Mem. Op. at 42.

        The circumstances of St. John's own appointment nicely illustrate the

point.  Owen appointed St. John to Acting Director solely on the

recommendation of St. John's then-supervisor, Wiggins.  At the time, Owen

expected Wiggins to return to the position shortly, Dkt. 52-3 at 59, and so he

permitted her to pick her caretaker.  Moreover, Owen took pains to ensure

that St. John's increased responsibility could not be viewed as a promotion.

He required St. John to remain in a cubicle to oversee his division even as

the Director's office sat empty.  *See* Dkt. 44-3 at 138.  This sequence of

events is fully consistent with racial discrimination informing Owen's

decision not to promote St. John to the position permanently.

        The District Court also inferred, from the lack of Hispanics other than

St. John on the selection register for the CSI Director position, that Owen

never had another opportunity to promote a Hispanic.  Mem. Op. at 42-43.

Even assuming this were true – and a jury certainly would not need to draw

that inference – it would not explain Owen's continued failure to hire a non-

Hispanic minority, such as the two candidates just below St. John on the

36

June 2008 register. And as Owen's efforts to whiten the October 2008 selection register demonstrate, discrimination affects not only who is selected from the register, but also who appears on it at all.

### 2. Owen's Preselection of Stajcar

A jury could readily find that, consistent with that history, Owen preselected a non-Hispanic Caucasian candidate, Stajcar. Preselection of one candidate "is undeniably relevant to the question of discriminatory intent" against another. *Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984). To be sure, preselection is not itself a Title VII violation. But here, Stajcar's preselection, alongside other record evidence, tends to show that Owen – consistent with his history of hiring only non-Hispanic Caucasians to GS-15 positions – preselected Stajcar for this one.

The District Court's conclusion that preselection "is not supported by the record evidence," Mem. Op. at 39, not only improperly resolved inferences against the non-moving party but is against the weight of the evidence, which strongly suggests Owen had selected Stajcar before he posted the position. In finding otherwise, the District Court relied on an overly technical reading of certain details and missed the big picture. Parsing the language of a June 18, 2008 e-mail exchange between Owen and Stajcar, the District Court determined that Stajcar did not actually "tell

37

Stajcar to apply" or tell him "he had the requisite time in grade" to qualify.

Mem. Op. at 39-40 (quoting Dkt. 52-4 at 178-79, June 18, 2008 E-mail

between Owen and Stajcar).  Whether or not Owen literally told Stajcar to

apply, what he indisputably said – "[Y]ou are more than ready for a GS 15

director position, and CSI would fit you well" – conveyed precisely the same

message.  Indeed, Stajcar testified that he only applied for the position

because of what he perceived as Owen's encouragement.  Dkt. 52-4 at 168.

Moreover, the District Court ignored completely other evidence

demonstrating preselection.  Owen acknowledged that he was "interested" in

selecting Stajcar for the June 2008 opening when they had that e-mail

exchange.  Dkt. 52-3 at 85.  Stajcar applied but did not appear on the June

2008 selection register because he was not qualified; after not seeing

Stajcar's name, Owen chose not to select from that register.  In August 2008,

Owen asked Stajcar when he would qualify and Stajcar replied that it would

be September 2008.  Dkt. 52-3 at 88-89.  Owen reposted the position in

October 2008.  Owen's decision first to select nobody when he could not

select Stajcar and then to ensure Stajcar's eligibility before reposting the

position further suggests that this supposedly open competition ended before

it began.  *See Krodel*, 748 F.2d at 708 (preselection finding upheld where

"the original vacancy announcement was cancelled" and subsequent one "tailored" to ensure that preferred candidate was deemed qualified).

The District Court then held that, even assuming preselection occurred, a jury could not find it relevant to whether discrimination occurred. Mem. Op. at 40. That conclusion, for which it cited only other district court opinions, flatly contradicts this Court's precedent. *See Krodel*, 748 F.2d at 709. And whether or not preselection can inform an inference of pretext (and ultimately discriminatory intent) in other cases, surely it can here. A jury could find that Owen preselected Stajcar not simply to advance a favored candidate, but also to further the discriminatory hiring pattern described above. Additionally, Owen's refusal to acknowledge Stajcar's preselection in the face of clear evidence further undermines his credibility regarding his reasons for passing over St. John.

### 3. *Owen's Failure to Utilize a Normal Hiring Process*

Having preselected Stajcar for the position, Owen engaged in a perfunctory hiring "process" that involved no real effort to inform himself as to the candidates' qualifications. A jury could find that Owen, like others in the leadership of Customs and Border Protection, knew well that such process is a safeguard against discrimination and avoided it precisely so as to continue his discriminatory hiring pattern by refusing to hire St. John.

39

As Assistant Commissioner Gina testified, one of the reasons to use interviews, reference checks, and other processes is to remove the bias that otherwise inevitably creeps into the selection process even for those trying to avoid it. Gina explained:

> When you're in the agency for 29 years, there's people you know, [and] you don't know, and you don't want to use your bias of knowing somebody to inadvertently discriminate against somebody that I may not have personal experience with.

Dkt. 52-3 at 478.

Whereas a conscientious decision-maker like Gina used process to avoid even inadvertent discrimination, a jury could infer that Owen consciously eliminated any process in order to facilitate intentional discrimination. Eschewing interviews, reference checks, or any other process that would familiarize him with the candidates, he simply relied, he now contends, on his personal knowledge of the candidates' qualifications, making no record of what he knew or how it informed his decision. Dkt. 52-3 at 58-63. A jury could find that discriminatory motivation connects the "process" Owen employed and the results he reached, such as passing over St. John and never promoting a racial minority to a GS-15 position. That the process Owen employed here "inexorably maintained the existing zero is strong evidence that it was intended to do so." *See Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 524 n.4 (7th Cir. 1994).

40

A jury could find that someone trying in good faith to evaluate candidates' leadership skills – an inherently subjective trait that does not appear on a resume – would find it useful to talk to the candidates themselves and those who know their work well, and would build a record of how the decision was made.  By contrast, someone intending to promote a less qualified candidate for discriminatory reasons talks to as few people and considers as little material as possible, in order to make the decision-making process opaque and difficult to challenge.  A jury could find that Owen's purported reliance entirely on his personal knowledge of the candidates' abilities was simply a smokescreen meant to hide from scrutiny his discriminatory refusal to hire St. John.  Against the background of the other evidence already described, a reasonable juror could infer that Owen chose not to interview, contact references for, or otherwise learn more about the top candidates on the June 2008 register – all of them racial minorities – because he already had decided not to hire them for discriminatory reasons and did not want information that might problematize that decision.

The District Court found Owen's idiosyncratic hiring methods irrelevant simply because Customs and Border Protection neither required a particular process nor customarily employed a particular one.  It interpreted this Court's decisions as standing for the proposition that a hiring process

only informs an inference of pretext where the process is inconsistent with an established policy. Without an established policy, there can be no such deviation, the District Court reasoned. *See* Mem. Op. at 39. Once again, this reasoning is far too formalistic. It also ignores contrary evidence in the record.

In fact, Customs and Border Protection officials testified that it was routine at the agency to utilize some sort of systematic process before selecting for an important position such as CSI Director. While no particular process was required, every official testified to doing something – at the very least, interviews and reference checks for the top candidates. *See, e.g.*, Dkt. 52-3 at 215 ("I have always sought [a] reference check, and we have always conducted interviews of the prospective candidates as a part of the recommendation and selection process.") (testimony of Skinner). Indeed, multiple officials testified that they commonly spoke not only with a candidate's current supervisor, but also previous ones, in order to "have a better sense of who the employee is." Dkt. 52-3 at 178 (testimony of Jaramillo); *accord id.* at 160 ("You want to go back and talk to people that they worked for prior to their current position.") (testimony of Wiggins). And some officials, like Gina, went further, using a panel to review eligible

candidates, and/or creating a matrix to compare objectively the qualifications of the top candidates.

A jury could find that Customs and Border Protection – like most any other employer – generally employs the hiring process necessary to ensure that decision-makers make the best (and least discriminatory) possible decision.  Owen – and Owen alone, as far as the record indicates – deviated from that custom, taking no steps to learn about the "leadership" qualities he now contends he sought.  Such an unexplained and unjustified deviation from the hiring practices one would expect from an employer focusing on those qualities suggests that those qualities did not truly drive the decision. The question is not whether the deviation is from mandatory hiring practices or a rigid custom; rather, it is whether a jury can infer that the unusual process either facilitates a discriminatory result or is inconsistent with the reasoning now put forward to justify the decision.

For example, in *Lathram v. Snow*, 336 F.3d 1085, 1093-1094 (D.C. Cir. 2003), an agency chose to open competition for a position to those outside the government, contrary to its usual practice when selecting for equivalent positions.  By doing so, it triggered a veteran-preference requirement that would not apply to a purely internal hiring process.  The plaintiff, who would have been the top-rated candidate without the veteran

43

preference, fell just short of another candidate because of it. This Court

found that a jury could infer pretext where "the government offers no

explanation for why [the agency] decided to structure the application process

for the position in a way that made [the winning candidate's] preference

applicable." *Id.* at 1094. Although the veteran's preference was not

inherently problematic, and although agency officials had discretion whether

to open competition outside the agency, this Court found that a jury could

infer that, in that particular context, the process used was meant to guide the

selection process toward a predetermined and discriminatory result. *Id.*

Here, such an inference is even more available, because Owen's

"process," unlike the use of a veteran preference, *is* inherently problematic.

When one with Owen's history of discriminatory hiring results chooses to

avoid any process that could protect against discrimination, a jury can infer

discriminatory intent.

### C. In Light of St. John's Superior Qualifications and Sterling Performance History, a Jury Need Not Believe That Owen Found Him Unqualified Based on a Small Number of Ambiguous Incidents

For all the reasons described above, St. John marshalled more than

sufficient evidence of pretext under this Court's precedents. That should

have been enough for St. John to survive summary judgment, unless

Defendant could produce evidence so irrefutable that any jury must accept as

44

true Owen's account of why he rejected St. John. Defendant did not come close to meeting that standard.

The District Court nonetheless granted summary judgment. It uncritically accepted Defendant's contention that a handful of incidents demonstrated to Owen contemporaneously that St. John lacked the requisite "leadership" abilities. *E.g.*, Mem. Op. at 5 ("defendant's concerns with the plaintiff surfaced almost immediately"); *id.* at 43 (St. John "demonstrated leadership deficiencies multiple times"). Rather than viewing the record most favorably to St. John, it ignored evidence that contradicted Defendant's narrative and assumed the truth of self-serving testimony from Owen that a jury would be entitled to disbelieve. It also granted Defendant numerous inferences regarding the significance of e-mail chains that offer only arguable and ambiguous support for Defendant's narrative. Put simply, the District Court decided the motion based on its own view of the record rather than on the reading a reasonable jury could adopt.

A jury, rather than accepting Defendant's characterization of these e-mails, would read them for itself. Having done so, it could find in them evidence only of routine bureaucratic events. It could find that the larger significance that Owen now attaches to these e-mails and the underlying events went unremarked upon at the time precisely because they reflected

little, if any, failing on St. John's part. It could conclude that Owen did not, in fact, draw conclusions from them contemporaneously that explain his passing over the most obvious candidate for the permanent position for a less qualified candidate. Such a conclusion is particularly available because, inconveniently for Defendant, some of the events to which Owen now points to justify his supposed determination that St. John was unqualified occurred *after* he claims he made that determination.

Rather than crediting Owen's current position regarding what he thought of St. John's performance, a jury could find that Owen spoke truthfully in 2008, when he said St. John was doing "an excellent job." Dkt. 52-3 at 76. Such a finding, unlike the story Defendant tells now, is consistent with the perfect performance evaluations St. John received until this litigation as well as considerable testimony that St. John performed well (including with respect to his leadership) before, during, and after his stint as Acting Director.

### 1. *Contrary Evidence Undermines Defendant's Account of What Owen Took From the Incidents Upon Which He Now Relies*

Not only would a jury look for itself at the e-mail chains Defendant proffers, but it would have several reasons to do so very skeptically. A jury would not look at these e-mails in isolation, but would do so against the background of considerable material in the record that undermines

46

Defendant's narrative that these incidents led Owen to believe that St. John lacked the requisite leadership ability.

To start with, even assuming Owen could have drawn broad conclusions about St. John's ability from these incidents, he made no record of actually doing so, in the e-mail chains themselves, in any performance evaluation, or otherwise. Quite to the contrary, as described above, Owen explicitly told St. John in 2008 that he was doing an excellent job and that Owen was happy with his work. He expressed similar sentiments in recommending St. John highly to Hinojosa. His failure to document his supposed view about St. John's ability contemporaneously undermines his credibility in relying on it now. *See Hamilton*, 666 F.3d at 1355-57.

A jury might find Owen's failure to document his supposed view contemporaneously particularly problematic because "lack of leadership ability" is such a subjective conclusion. As this Court has warned, highly subjective rationales for employment decisions must be treated "with caution" because they "may be used to 'mask' or 'camouflage' discrimination." *Id.* at 1356 (quoting *Aka*, 156 F.3d at 1298). This Court has made clear that a defendant cannot immunize itself from real scrutiny by proffering a justification that is "difficult" to disprove. *See Vatel*, 627 F.3d at 1246-47.

47

The District Court, while acknowledging the subjectivity of the leadership rationale, declined to treat it with the required caution.  Mem. Op. at 37.  Instead, it held that a subjective rationale must be examined with extra scrutiny only when "the plaintiff's qualifications [a]re significantly better than the selected candidate's."  *Id.*  Nothing in this Court's precedents suggests that limitation.  And there similarly was no basis for the District Court's conclusion that Owen so well documented St. John's "specific deficiencies" as to alleviate any concern about the subjectivity of his rationale.  In fact, Owen did not document those supposed deficiencies at all.

Finally, a jury could look skeptically at the evidence Defendant offers to support Owen's supposed conclusion because that conclusion is inconsistent with St. John's record.  A jury easily could conclude that St. John's record – including not only his paper qualifications but his reputation within the agency – was such that Owen could not have drawn such broadly negative conclusions about his ability from such ambiguous incidents.

At the time of the June 2008 posting, St. John had twenty-one years of experience in Customs and Border Protection, including seventeen years at Headquarters.  He had served four years at CSI, including several months as Acting Director.  He had a sterling record at CSI, with perfect performance evaluations.

Those who knew St. John's work – including from his stint as Acting Director – testified in detail to, among other things, his strong leadership skills.  Two former CSI directors (Gina and Wiggins), who presumably know well the qualities required for the position, testified that St. John's performance was consistently outstanding.  Dkt. 52-3 at 111-12, 114-21, 123-25, 134-37, 267-79, 443, 451, 454, 456-59, 462-63, 472; Dkt. 52-4 at 47, 49.  Several of St. John's employees and colleagues also testified that they enjoyed working with St. John and thought highly of his skills as a supervisor.  A CSI Branch Chief (James Carson), who reported to St. John while he was Acting Director, testified that St. John was a good leader for CSI, worked well with other Customs and Border Protection offices, was responsive to his staff, and encouraged innovation.  *See* Dkt. 52-3 at 239-43, 245-47.  Another of the Branch Chiefs reporting to St. John (Febe Hernandez) stated that St. John brought energy and experience to the Acting CSI Director position, and that she has not experienced the same excellent leadership that St. John provided before or since.  *See* Dkt. 52-4 at 100-01.  She further stated that she was shocked and disappointed when he did not receive the permanent CSI Director position.  *Id.* at 102.

The District Court nonetheless dismissed this evidence, reasoning that St. John's performance before he became Acting Director is not relevant to

49

his performance in that position. *See* Mem. Op. at 24. In fact, some of the

evidence St. John proffered was of his performance as Acting Director.

Moreover, St. John's years of perfect performance evaluations, good

relationships, and effective management could inform a reasonable juror's

conclusions regarding what really happened in the incidents to which Owen

now points and whether they really led him to find St. John unqualified. *See*

*Geleta*, 645 F.3d at 414 (jury can infer pretext from evidence that proffered

rationale is not credible); *EEOC v. Boeing Co.*, 577 F.3d 1044, 1052 (9th

Cir. 2009) ("*Boeing"*) (coworker testimony about performance permitted

inference that performance justification for termination "was not only

inaccurate, but is simply unworthy of credence."). That so many supervisors

and colleagues had such a positive impression of St. John's performance –

including of the leadership qualities on which Owen's decision was

purportedly based – is powerful evidence that Owen's supposed reliance on

performance issues is pretext. *See Boeing*, 577 F.3d at 1052 ("Coworkers'

and managers' assessments of an employee's skills and performance can be

probative of pretext."). A jury would not have to credit Owen's self-

interested testimony over that of all these disinterested witnesses, as the

District Court did. Mem. Op. at 41; *see also In re Dana Corp.*, 574 F.3d at

153. Indeed, it would not have to credit Owen's testimony now over his

own statements to St. John and to Hinojosa (to whom he recommended St. John as a leader) – both made while St. John was Acting Director – that suggest he formed a different view of St. John's abilities.[6]

A jury that chooses not to credit Owen's current spin on these incidents could, in turn, easily conclude that Owen, with discriminatory intent, passed over St. John in favor of a less-qualified candidate. Where a plaintiff's qualifications are plainly stronger than the selectee's, that evidence is probative of pretext. *See Aka*, 156 F.3d at 1294 (employers do not usually consciously "select[] a less-qualified candidate . . . unless some other strong consideration, such as discrimination, enters into the picture."); *accord Hamilton*, 666 F.3d at 1352, 1355; *see also Walker v. England*, 590 F. Supp. 2d 113, 140 (D.D.C. 2008). While a plaintiff relying *solely* on superior qualifications to establish discrimination must show that he or she was "significantly" or "markedly" more qualified, a plaintiff who (like St. John) can produce other indicia of pretext need not meet that standard for comparative qualifications evidence to contribute to an inference of discriminatory intent. *See Hamilton*, 666 F.3d at 1352 (finding comparative

---

[6] A jury similarly need not credit at all the testimony of Frank Jaramillo that he and St. John sometimes differed regarding staff assignments. *See* Mem. Op. at 7-8.

qualifications evidence sufficient when combined with "procedural

irregularities in a highly subjective selection process").

A jury could find St. John's qualifications sufficiently superior to

Stajcar's to bolster an inference of pretext. Stajcar had served just seven

years at Customs and Border Protection, none of which was in CSI, none of

which was in a permanent position at Headquarters, and none of which was

at the same level of seniority as the acting position that St. John then held.

*See supra* at 5 (organizational chart). A jury would not have to accept, as

the District Court did, Mem. Op. at 32, Stajcar's self-interested testimony

that his position as director of a field office entailed more responsibility than

St. John's as a CSI branch chief. *See Reeves*, 530 U.S. at 151 (self-

interested testimony should be disregarded on summary judgment motion).

Moreover, Stajcar had only served in that position for a few months by the

time Owen, by his own admission, began considering how to install him as

CSI Director instead of St. John; a jury could find, in accordance with the

agency's own rule requiring service as a GS-14 for a year before eligibility

for a jump to the GS-15 level, that Stajcar's experience at that point was not

close to being the equivalent of St. John's. And a jury would not be required

to accept at face value Defendant's counterintuitive position that Owen

favored Stajcar precisely because he was coming from outside CSI. A jury

MATERIAL UNDER SEAL DELETED

could find, instead, that this explanation amounts to a lawyerly attempt to spin a weakness – Stajcar's comparative lack of relevant experience – into a strength.

St. John also received ███████████████ when he served at Stajcar's level.  Dkt. 52-3 at 267-79; Dkt. 52-4 at 47, 49; Pl. Ex. 31 (under seal).  ████████████████████████████

████████████████████████████████████

█████████████████████████ before the selection at issue here.  In particular, ████████████████████████

████████████████████ Pl. Ex. 31 (under seal); Pl. Ex. 7-S, Skinner Dep. at 89 (under seal).  ███████████████████

████████████████████████████████████

████████████████████ That Owen reached a contrary conclusion, a jury could find, indicates that Owen's supposed concern about leadership ability is pretext.

The bottom line is that a reasonable jury could find St. John to be objectively more qualified for the CSI Director position and could find that difference in qualifications relevant to the ultimate question of whether discrimination informed Owen's decision.  It is irrelevant whether that jury could find him sufficiently more qualified to "infer discrimination on the

basis of a comparison of qualifications alone," Mem. Op. at 31 (citation removed), as it would not be asked to do so.

In nonetheless finding St. John's comparative qualifications evidence irrelevant, the District Court accepted Defendant's argument that St. John was unsuccessful as Acting Director.  Mem. Op. at 33.  But a jury would not have to accept that assertion at face value.  As explained more fully below, Defendant's evidence of St. John's supposed leadership issues is hardly conclusive, and no other contemporaneous evidence supports Defendant's position.

In particular, a jury could find that Owen's awarding St. John a $2,000 bonus indicates that he believed St. John's job performance was strong at the time and further undermines his credibility in now claiming that St. John's performance was deficient.  A jury certainly would not have to accept Defendant's argument, unsupported by any contemporaneous evidence, that this bonus actually reflected a *negative* performance assessment.  *See* Mem. Op. at 26-27.  A jury could find that St. John received a lower bonus than the GS-15 permanent directors only because he was not a GS-15 permanent director, rather than because his performance was inferior.  With respect to this bonus, the District Court once again accepted Defendant's proffered inference instead of determining what

inference a jury *could* draw.  And nothing in the record prevents a jury from inferring that one who awards a bonus thinks highly of the performance of the one receiving it.

### 2.  *A Jury Could Find That the Incidents Say Little About St. John's Leadership Ability or What Owen Thought of It*

Against that background, a reasonable jury could find that the incidents on which Owen relies say little about St. John's leadership ability or Owen's contemporaneous views about St. John.  The District Court, although charged with considering these events in the light most favorable to the plaintiff, both described them from Defendant's point of view and accepted all of Defendant's proposed inferences regarding them.  *See* Mem. Op. at 5-8.  It found not only that these incidents objectively reflected poorly on St. John's performance, but that Owen believed as much and told St. John contemporaneously.  *See id.* at 5 (finding "at least eight separate occasions when the plaintiff was notified of a deficiency in his performance."), 40-41 ("[T]here is a wealth of evidence indicating Owen made the plaintiff aware of his deficiencies in e-mails.").  But a jury easily could find otherwise.

For example, a jury might be unconvinced that an April 2008 e-mail exchange between St. John and Richard DiNucci demonstrates St. John's poor performance.  *See* Dkt. 44-3 at 84-85.  This exchange stemmed from the decision to appoint one of St. John's employees as point of contact with

a different division of Customs and Border Protection, the Secure Freight

Initiative ("SFI").  That decision was made after discussions that involved

Owen, DiNucci (who headed SFI), and Todd Horton, an agent with

Immigration and Customs Enforcement ("ICE") – but not St. John.  St. John

told DiNucci and Horton that, because he had not been consulted, the

assignment was "premature."  He asked his colleagues to speak to him first

in the future:  "As you know you have my full cooperation.  All you have to

do is ask."  Dkt. 44-3 at 84.  In response, DiNucci belittled St. John, calling

his concerns "ridiculous."  Dkt. 44-3 at 84.

    This exchange hardly demonstrates that St. John failed to follow the

direction "that cooperation in [Cargo and Conveyance Security] should be

seamless and that there was no program wall of separation," much less that

Owen drew such a conclusion from it.  Dkt. 44-5 at 4.  To the contrary, St.

John testified that Owen agreed with him at the time that DiNucci and

Horton should have spoken with him.  Dkt. 52-3 at 350-51.  Nor is it

obvious – and Defendant does not explain – how Owen could have drawn a

conclusion so critical of St. John from this e-mail exchange and the

underlying decision to make a personnel decision regarding St. John's

employee without involving St. John.  On its face, this incident reflects more

poorly on DiNucci and Horton (and on Owen himself) than on St. John, and
Owen never said otherwise at the time.

Defendant also puts great weight on an e-mail from DiNucci to Owen
complaining that St. John directed a CSI employee stationed in Egypt not to
participate in a meeting of DiNucci's SFI unit.  Dkt. 44-3 at 87.  There is no
other contemporaneous evidence regarding this incident, and Owen now
says of it only:  "I directed Mr. St. John to assist SFI."  Dkt. 44-5 at 5.  St.
John explained that he was happy to do so, and that the problem between the
two men arose only because DiNucci – as was his wont – had taken the
liberty of reassigning St. John's employees without telling St. John he was
doing so.  Dkt. 52-3 at 383-84.  Once again, a jury could find no indication
that St. John was at fault or that Owen believed him to be.

A jury similarly could find the other incidents upon which Defendant
and the District Court rely to lend such weak support to a negative
assessment of St. John's leadership qualities that Owen's reliance on them is
not credible.  All of them are vaguely described, or minor, or took place after
Owen already had ostensibly decided in August 2008 that St. John lacked
the leadership qualities necessary for the job, or all of the above.

For example, to support his otherwise conclusory assertion that St.
John could not "recogniz[e] or adapt[] to changing environments" and was

"unable to resolve conflicts across organizational lines," Owen points to a

September 2008 e-mail exchange regarding whether a CSI employee

returning from an overseas post should be stationed in Washington, D.C. or

in a field office.  Dkt. 44-5 at 5.  This exchange could not have influenced

Owen's supposed determination a month earlier that St. John was not

qualified to become CSI director, as an employer cannot "have been

motivated by knowledge it did not have."  *Patrick v. Ridge*, 394 F.3d 311,

319 (5th Cir. 2004) (citation omitted).  But even if Owen had considered this

incident, it is difficult to understand how he could draw such a conclusion

from it.

　　　The e-mail chain began with Owen expressing Assistant

Commissioner Allen Gina's request to relocate the employee to a field

office.  Dkt. 44-3 at 96.  In response, St. John explained that a Customs and

Border Protection rule barred such a move, and that the rule had been

consistently applied to employees in similar situations.  *Id*.  Gina then

provided detail regarding the origin of that rule, and proposed that it be

modified to reflect changes in organizational structure so long as cost

permitted.  *Id.* at 97-98.  St. John replied that cost was not a problem, but

expressed some concern about the appearance of changing a settled rule to

accommodate one person.  *Id.* at 97.  A few days later, St. John announced

58

Owen's decision that the employee was to be moved to the field office.  *Id.* at 95.

Even if this incident had occurred early enough to inform Owen's decision-making regarding St. John's leadership ability – and it did not – a jury could find that nothing occurred that possibly could warrant the significance that Owen now attaches to it.  St. John, who as Acting Director was not in a position to change policy, accurately stated that current policy barred Gina's request.  Gina, a high-level official who could change policy, then asked for it to be reconsidered, and St. John acceded to that request.  As Gina later testified, the entire exchange was professional.  Dkt. 44-7 at 51.  A jury easily could find that this evidence does not support Defendant's position.  Indeed, it could infer pretext from Defendant's reliance on this routine bureaucratic back and forth that occurred *after* Owen had decided not to promote St. John.

A jury similarly could find pretextual Defendant's reliance on a December 2008 e-mail exchange between Owen and St. John regarding ICE's role in supporting the Customs and Border Protection Commissioner's trip to Buenos Aires.  This amicable exchange ends with Owen agreeing with St. John that ICE should play a greater role and stating that he will speak with ICE about it.  *See* Dkt. 44-3 at 89-90.  And even if this exchange

59

otherwise could support an adverse conclusion regarding St. John's performance, it occurred too late to be relevant to Owen's thinking. "[A]n employer may not prevail . . . by offering a 'legitimate and sufficient reason for its decision if that reason did not motivate it *at the time of the decision.*'" *Patrick*, 394 F.3d at 318-19 (emphasis in original).

Defendant also points to an e-mail that St. John sent to his team in Rotterdam instructing them not to provide transportation from the airport for a delegation of congressional staffers, because ICE or the State Department bore responsibility for that task. Dkt. 44-3 at 93. St. John's testimony – which must be taken as true in this posture – is that he relayed to Owen the reasons for his decision, and Owen agreed with him at the time (as he did in regard to Buenos Aires as well). Dkt. 52-3 at 365. A jury is entitled to credit that testimony, leaving this incident of no help to Defendant.

Finally, Defendant points to incidents where, Owen now says, St. John should have informed him sooner of developments. But a jury could easily find that Owen could not and did not actually conclude from these isolated incidents that St. John was not up for the job.

The first such incident involved a CSI officer who was hospitalized on February 21, 2008, early in St. John's tenure as Acting Director. Owen was informed of the hospitalization on February 26. He told St. John the next

day that, in the future, he should be informed immediately "whenever one of the CSI officers is hospitalized or hurt." Dkt. 44-3 at 101. There is no indication that, once Owen expressed this preference, he ever had reason to bring the subject up again.[7] The second incident involved a CSI officer whom St. John removed from his post for speaking at a seminar without authorization. Owen, while agreeing with the merits of St. John's decision, told St. John to, in the future, involve him in such decisions. St. John apologized and said such a misunderstanding would "not happen again." Dkt. 44-3 at 103. There is no indication that it did.

A jury could find that Owen could not have perceived these two incidents from St. John's first months heading CSI as unusual, let alone as disqualifying St. John from the job. These events are unremarkable on their face. Stajcar, once installed in the position, had the identical experience of Owen "coming to me a few times saying ['W]hy wasn't I notified about this[?']" Dkt. 52-4 at 172. Indeed, Owen told Stajcar to inform him more quickly after almost identical incidents – "issues with personnel overseas" and an agent's hospitalization. *Id.* And others testified that Owen criticized

---

[7] The District Court pointed to a December 2008 incident as further evidence of "communication and notification problems." Mem. Op. at 6. But Owen could not have considered this incident in passing St. John over the previous summer.

them as well for failing to report events as quickly as Owen wanted.  Dkt.

52-3 at 220 (testimony of Skinner), 234 (testimony of Carson).

As a top agency official explicitly testified, and as a jury might find

anyway as a matter of common sense, anyone stepping into a new role needs

time to learn the level of detail that is expected to be reported up the chain:

> You always need to get to that calibration between yourself and
> a manager.  Every time you change roles.  I had it with me over
> the years as well. . . . It's not anything there's a playbook to
> follow.  It's not anything that instinctively comes with you any
> time you move into a position. . . . What the boss needs to know
> and what you need to handle yourself, what are the critical
> issues that need to be brought to your supervisor or superior's
> attention.  You need to do that a few times until you can
> actually get to the right balance and calibration between a
> leadership team.

Dkt. 52-4 at 67.

A jury thus could find that Defendant's evidence establishes no more

than that St. John had the same learning curve as did everyone else newly

installed in the position regarding what information to pass up to Owen.  The

District Court nonetheless found Stajcar's similar experiences irrelevant

because they occurred after the decision to promote Stajcar instead of St.

John.  Mem. Op. at 33 n.10.  It failed to grapple with the purpose for which

St. John proffered the evidence.

Owen contends now that he deemed St. John unqualified in part

because St. John failed to notify Owen of events in a timely manner.  His

credibility is seriously undermined by evidence that St. John performed no worse in this respect than did Stajcar, or for that matter anyone else, yet Owen was not similarly displeased with Stajcar's performance. A jury could readily conclude that Owen's reliance on a "deficiency" that St. John apparently shared with everyone else under Owen's supervision says little about St. John's lack of leadership or what Owen thought of it, but instead demonstrates the pretextual nature of the story Owen now tells.

The bottom line is that a jury need not accept Defendant's story that these incidents, either separately or collectively, actually drove Owen's decision not to promote St. John to the permanent CSI Director position. It could instead find, consistent with St. John's other evidence suggesting pretext, that Defendant glommed onto these incidents for the first time in litigation in order to defend the otherwise indefensible decision to pass over a clearly qualified candidate.

* * * * *

At the end of the day, this case boils down to a very simple question: Is Owen credible? Owen says he sincerely believed that St. John was not up to the job because of certain specific incidents. He made no contemporaneous record memorializing such a belief, and the record contains numerous reasons to doubt the story he tells now. Such reasons

63

include the disjunction between the story Owen now tells and his own prior statements that he believed St. John was doing an excellent job; Owen's lies about not being responsible for St. John's being passed over; Owen's history of never promoting racial minorities to similar positions; and the sham process Owen employed to avoid hiring St. John and instead install in the position a less qualified non-Hispanic Caucasian candidate.

A jury thus could readily find reason to disbelieve Owen. Nothing in the record regarding the incidents themselves proves conclusively that Owen genuinely relied upon them. Indeed, some of them occurred after Owen passed over St. John, and so they could not have formed the basis of Owen's decision to do so.

All of this should be for a jury to sort out. Perhaps it will believe Owen's account; perhaps it will not. Either way, the District Court acted improperly in adopting Defendant's side of this heavily contested story.

## CONCLUSION

For the above reasons, this Court should reverse the District Court's

grant of summary judgment and remand this case for further proceedings.

Dated:  October 22, 2014

Respectfully submitted,

/s/ Glenn Schlactus
Glenn Schlactus
Jennifer I. Klar
Sasha Samberg-Champion
Tara K. Ramchandani
Jean Zachariasiewicz
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W.
Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

*Attorneys for Appellant*

## REQUEST FOR ORAL ARGUMENT

This appeal involves a complex and disputed factual record. Plaintiff respectfully submits that oral argument would benefit this Court's consideration of this appeal.

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)(B)

I certify that the total word count for this brief, including headings, footnotes, and quotations but excluding the Table of Contents, Table of Authorities, Glossary, and Statement with Respect to Oral Argument is 13,954.


/s/ Tara K. Ramchandani
Tara K. Ramchandani

RELMAN, DANE & COLFAX PLLC

## CERTIFICATE OF SERVICE

I certify that the accompanying Plaintiff-Appellant Samuel St. John's

Opening Appellant Brief (Public Copy) was served upon Defendant-Appellee via

ECF on October 22, 2014.


/s/ Tara K. Ramchandani
Tara K. Ramchandani

RELMAN, DANE & COLFAX PLLC